UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

BOBBY DOUTHIT,                                )
            *Plaintiff*,                      )
                                              )
        *vs.*                                 )        1:12-cv-1584-JMS-TAB
                                              )
TC HEARTLAND LLC F/K/A HEARTLAND              )
SWEETENERS, LLC,                              )
            *Defendant.*                      )

## ORDER

Plaintiff Bobby Douthit brings this race discrimination suit against his former employer

Defendant TC Heartland LLC ("Heartland"). [Filing No. 1.] Currently pending before the Court

is Heartland's Motion for Summary Judgment. [Filing No. 37.] For the reasons that follow, the

Court **GRANTS** Heartland's motion.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because

there is no genuine dispute as to any material fact and, instead, the movant is entitled to

judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes

clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must

support the asserted fact by citing to particular parts of the record, including depositions,

documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by

showing that the materials cited do not establish the absence or presence of a genuine dispute or

that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P.

56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that

would be admissible in evidence, and show that the affiant is competent to testify on matters

stated.  Fed. R. Civ. P. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment.  Fed. R. Civ. P. 56(e).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).  The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898.  Any doubt as to the existence of a genuine issue for trial is resolved against the moving party.  *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### BACKGROUND

Heartland manufactures artificial sweetener products at a facility in Indianapolis.  [Filing No. 40, at ECF p. 1.]  Mr. Douthit, who is African American, was hired by Heartland on January 19, 2010, as a Blender Assistant and was paid $11.00 per hour.  [Filing No. 42, at ECF p. 84.]  Three months later he was promoted to Blender and his pay increased to $12.50 per hour.

[Filing No. 42, at ECF p. 85.] He was subsequently given two more raises by Heartland and made $13.00 per hour when his employment with Heartland ended in June 2011. [Filing No. 42, at ECF p. 100-04.]

Blenders at Heartland were responsible for, among other things, mixing the ingredients necessary to make Heartland's various artificial sweeteners. [Filing No. 41, at ECF p. 27.] They also supervised temporary workers who, when demand required, would perform some of the more difficult manual labor for the Blenders. [Filing No. 41, at ECF p. 30.]

Blending at the Heartland facility was performed in three shifts. [Filing No. 42, at ECF p. 70.] The third shift was the night shift, running from 10:00 p.m. to 6:00 a.m., Sunday through Thursday. [Filing No. 41, at ECF p. 48.] Near the end of 2010, Mr. Douthit's daughter was born, which led him to ask Dustin Mehringer, the facility's Production Manager, if Mr. Douthit "could move to third shift at the plant so [he] could stay home during the day to take care of [his] daughter." [Filing No. 54-1, at ECF p. 1.] Mr. Mehringer granted Mr. Douthit's request. [Filing No. 54-1, at ECF p. 1.] Mr. Douthit was the only Blender who worked the third shift. [Filing No. 42, at ECF p. 70.] He reported to Jose Salcedo, who worked first shift but was in charge of the entire Blending Department. [Filing No. 42, at ECF p. 89-90.] During the third shift, however, Mr. Douthit was directly supervised by third-shift supervisor Mike Buis. [Filing No. 42, at ECF p. 90.]

On February 11, 2011, Heartland's Director of Global Quality Assurance, Mark Hayden, sent an email to several Heartland employees stating, in relevant part, that "[e]ffective immediately it is the directive from corporate quality assurance that all employees within the blending department pass a qualifying test of mathematics and comprehension. All existing as well as new employees moving into these positions will be required to pass the test with a

minimum score of 80%." [Filing No. 41, at ECF p. 84.] Mr. Mehringer responded to the email, asking Mr. Hayden whether Blenders could use calculators on the test since they could use them during blending, to which Mr. Hayden replied, "NO." [Filing No. 41, at ECF p. 83-84.] At the time of Mr. Hayden's email, all of Heartland's Blenders, including Mr. Douthit, were African American. [Filing No. 40, at ECF p. 4.]

Two Blenders failed the test the first time they took it. [Filing No. 40, at ECF p. 3.] One of the two Blenders passed the test on the second try, while the other failed again and was offered another position until his third attempt, which he passed and then returned to his Blender position. [Filing No. 40, at ECF p. 3.] Before Mr. Douthit took the test, Mr. Buis provided Mr. Douthit with a copy of it to "ease his mind a little bit and kind of help him prepare and calm him down." [Filing No. 41, at ECF p. 57.] Mr. Douthit passed the test with a 95%, but Heartland thought there were things about his test that were "suspicious." [Filing No. 40, at ECF p. 4.] Specifically, his answers appeared to be in two or three different colors of ink, and he did not use any of the scratch paper to figure out the answers to the math problems. [Filing No. 40, at ECF p. 3-4.] Heartland therefore "suspected that [Mr.] Douthit might have used a calculator or had some other help on the test, and determined that he should re-take it." [Filing No. 40, at ECF p. 4.] Mr. Buis informed Mr. Douthit that he would have to re-take the test during a meeting on June 9, 2011, discussed in more detail below. During his deposition, Mr. Douthit could not remember why he changed pens during the test, [Filing No. 42, at ECF p. 127], stated that he did not use a calculator on the test, and said that he did the math calculations on a separate sheet of paper that he threw away after the test, [Filing No. 42, at ECF p. 161-62]. Mr. Douthit left his employment with Heartland before re-taking the test. [Filing No. 42, at ECF p. 135.]

In the thirty to forty-five days prior to Mr. Douthit's leaving Heartland in June 2011, Heartland changed various aspects of Mr. Douthit's employment, in what he believed was an attempt to encourage him to quit his job. [Filing No. 42, at ECF p. 52.] For example, Heartland did not provide him with Blending Assistants for a time, requiring him to complete third-shift blending on his own. [Filing No. 42, at ECF p. 58.] According to Mr. Douthit, this and other changes were out of the norm. [Filing No. 42, at ECF p. 60.]

Around that same time, Heartland decided to try and improve its blending process by increasing blending efficiency and cleanliness: instead of staging the material for each batch and cleaning the machines between batches, Heartland wanted to clean and stage several batches during the third shift, and then complete the actual blending during the other two shifts. [Filing No. 41, at ECF p. 28.] On June 9, 2011, Heartland Plant Manager Jeff Mack sent an email to senior Heartland employees, including Mr. Buis, stating, among other things that "[t]here are going to be changes in the blending room we are going to have blenders on 1st and 2nd only and all the prep will be done by the 3rd shift blender but he will be on days. I ask that all embrace these changes and help with any problems in blending we need to get blending fixed quickly, we are loosing [sic] money back there and a lot of it!" [Filing No. 41, at ECF p. 86.]

That same day, when Mr. Douthit arrived at work for the third shift, Mr. Buis told Mr. Douthit that he "had bad news." [Filing No. 42, at ECF p. 136.] Mr. Buis gave Mr. Douthit three letters from Heartland. The first informed Mr. Douthit that he would have to re-take the Blender test. [Filing No. 42, at ECF p. 136.] The second and third letters were disciplinary letters regarding two errors Mr. Douthit had made—namely, he wrote down the wrong ingredient for one batch of sweetener, [Filing No. 42-1], and he incorrectly documented a mistake and its correction regarding another batch, [Filing No. 42-2]. Both of the latter two letters served as

notices of the need to improve, but did not lead to any specific consequences for Mr. Douthit's employment. [*See* Filing No. 42-1; Filing No. 42-2.]

Lastly, Mr. Buis informed Mr. Douthit that blending was ending on third shift and that he would therefore be transferred to first shift. [Filing No. 42, at ECF p. 50.] Mr. Douthit asked Mr. Buis if there was any way he could stay on third shift because he had to take care of his daughter during the day, and that he would be willing to do a different job to stay on third shift. [Filing No. 42, at ECF p. 136.] Mr. Buis told him that there were no other jobs available on third shift and that he had to work first shift on Monday otherwise he did not have a job. [Filing No. 42, at ECF p. 136.] During his deposition, Mr. Douthit stated that Heartland knew he had a daughter and transferred him to first shift because it knew he would not be able to work that shift. [Filing No. 42, at ECF p. 56.]

Mr. Buis emailed senior Heartland employees later that day, explaining the result of his meeting with Mr. Douthit. [Filing No. 41, at ECF p. 87.] First, he noted that, with "[s]ome hesitation," Mr. Douthit "signed both disciplinary/informational documents," and Mr. Buis assured Mr. Douthit that "we are all under a microscope." [Filing No. 41, at ECF p. 87.] Regarding the shift change discussion, Mr. Buis wrote:

> I explained to him that 3rd shift would no longer blend or set up blends and we would concentrate on sanitation during these hours. I informed him that we thought enough of him to offer him a position on 1st shift, blending room and needed to report to work Friday morning, 6:00am. He stated that he could not work these hours because of family obligations. I offered to postpone his start date until Monday morning, 6:00am in order to allow sufficient time for him to make adjustments to his obligations. [Mr. Douthit] stated that I would have to fire him because he will not be able to work during these hours. After a lengthy conversation . . . I finally ended [it] stating to [Mr. Douthit] that he is expected to be at work Monday morning, 6:00am. . . . [Bobby] respond[ed] . . . 'I won't be here. I'm not quitting and you will have to fire me.' I shook his hand and stated 'I hoped to see him Monday morning.' [Mr. Douthit] then went home. (I offered him the option of leaving early)[.]

[Filing No. 41, at ECF p. 87.]

Mr. Douthit did not report to work for the first shift on Monday, June 13, nor at any other time. [Filing No. 42, at ECF p. 140.] Indeed, there is no evidence that Mr. Douthit ever had any further contact with Heartland or its employees. [Filing No. 42, at ECF p. 140.]

Shortly after Mr. Douthit's separation with Heartland, third-shift blending resumed. [Filing No. 41, at ECF p. 35; Filing No. 54-3, at ECF p. 1.] However, there is no evidence regarding precisely when it resumed. Heartland acknowledges that it performed third-shift blending after Mr. Douthit's departure, but Mr. Buis stated that this was the case because "[b]lending has resumed and stopped and resumed and stopped according to the workload. . . . [D]epending on many factors, . . . it could start and stop several times." [Filing No. 41, at ECF p. 35-36.]

On June 23, 2011, another Heartland employee, Monica Montgomery, sent an email to several Heartland employees complaining that the "environment at the plant is very hostile and uncomfortable" due to alleged racism. [Filing No. 56-1, at ECF p. 43-44.] In this email, she articulated a variety of complaints about particular individuals in Heartland's management. For example, she stated that Mr. Mack "allows his maintenance employees to use racial slurs," and that she heard Mr. Hayden say that "[i]f you don't look like me I don't want you here." [Filing No. 56-1, at ECF p. 43.]

Mr. Douthit filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on February 27, 2012, contending that Heartland discriminated against him on the basis of his race. [Filing No. 1-1.] The EEOC could not substantiate his allegations, and issued Mr. Douthit a right to sue letter on July 30, 2012. [Filing No. 1-2.] This lawsuit followed. [Filing No. 1.]

# III.

## DISCUSSION

Mr. Douthit brings this action pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981, alleging that Heartland discriminated against him on the basis of his race "by disciplining him and transferring him to a shift he could not work." [Filing No. 1, at ECF p. 4.] Heartland filed the instant Motion for Summary Judgment on both of Mr. Douthit's claims. [Filing No. 37.] Because discrimination claims under Title VII and § 1981 are "nearly identical, and [the parties] treat[] them identically," the Court will "apply the same analysis" to Mr. Douthit's claims. *Dass v. Chicago Bd. of Educ.*, 675 F.3d 1060, 1068 (7th Cir. 2012); *see McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009) ("[A]lthough section 1981 and Title VII differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical.") (citation and quotation marks omitted).

In opposing Heartland's motion, Mr. Douthit can prove discrimination "using either the direct or indirect method of proof." *Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 727 (7th Cir. 2013). He proceeds only under the direct method, so the Court need not address the indirect method. [Filing No. 55, at ECF p. 15-20 (arguing only that "[Mr.] Douthit can offer enough evidence under the direct method of proof from which a factfinder could infer that the transfer was discriminatory").]

To proceed under the direct method, a plaintiff must point "to evidence directly showing that her employer subjected her to an adverse employment action on an impermissible discriminatory basis—here, on the basis of race." *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014). In other words, Mr. Douthit must show that (1) he suffered an adverse employment action; and (2) that the action was taken on the basis of his race. *See id.* at 234-35 ("An element common to . . . both methods of proof[] is that she must have suffered a materially

8

adverse employment action."); *Dass, 675 F.3d at 1068* ("Even though [the plaintiff] is proceeding under the direct method, [she] still must demonstrate she suffered an adverse employment action."). Heartland contends that Mr. Douthit has insufficient evidence to make either showing, [Filing No. 38, at ECF p. 15-24; Filing No. 38, at ECF p. 30-33], but Mr. Douthit disagrees, [Filing No. 55, at ECF p. 14-20]. The Court will address each required showing in turn.

### A.   Mr. Douthit cannot prove that his transfer from third shift to first shift was a materially adverse employment action

Mr. Douthit only argues that one of Heartland's acts constitutes a materially adverse employment action: Heartland's transfer of him from third shift to first shift.[1] [*See* Filing No. 55, at ECF p. 14-15.] Heartland maintains that Mr. Douthit's transfer to first shift does not constitute a materially adverse employment action because mere lateral transfers are not materially adverse, and Mr. Douthit's transfer did not decrease his pay or change his benefits or duties. [Filing No. 38, at ECF p. 22-23.] Therefore, says Heartland, Mr. Douthit's desire to work third shift was a subjective preference, which is not considered a materially adverse employment action. [Filing No. 38, at ECF p. 23.]

Mr. Douthit responds that the transfer may not have been material to other employees, but it was material to him. [Filing No. 55, at ECF p. 14.-15] This is so, he says, because Heartland knew he needed to work third shift to be able to care for his daughter during the day; he asked Mr. Mehringer to be transferred to third shift for this specific reason in 2010, and told

---

[1] In his Complaint, Mr. Douthit alleged that Heartland discriminated against him on the basis of his race "by disciplining him and transferring him to a shift he could not work." [Filing No. 1, at ECF p. 4.] Heartland argued in its opening brief that its disciplining of Mr. Douthit was not an adverse employment action and thus not actionable under Title VII. [Filing No. 38, at ECF p. 18-19.] By arguing only that his transfer to first shift was an adverse employment action in his response brief, Mr. Douthit has abandoned any claim based on his disciplinary notices and the Court dismisses them with prejudice.

Mr. Buis during their June 9, 2011, meeting that he could not work first shift "because of his childcare obligations." [Filing No. 55, at ECF p. 14.] Relying solely on *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662-663 (7th Cir. 2005), Mr. Douthit argues that his unique need to work third shift made his transfer to first shift a materially adverse employment action. [Filing No. 55, at ECF p. 15.]

Heartland replies that Mr. Douthit's reliance on *Washington* is misplaced for three distinct reasons. [Filing No. 59, at ECF p. 3-6.] First, *Washington* involved a retaliation claim, which requires a different and lesser showing of materiality than a discrimination claim like the one at issue here. [Filing No. 59, at ECF p. 3-4.] Second, unlike in *Washington*, there is no evidence that Mr. Douthit's transfer had an economic impact on him. [Filing No. 59, at ECF p. 4-5.] Third and finally, unlike in *Washington*, Mr. Douthit has not adduced any evidence that the decision makers at Heartland who suspended third-shift blending, which necessitated Mr. Douthit's transfer to first shift, knew that Mr. Douthit's childcare obligations prevented him from working third shift. [Filing No. 59, at ECF p. 5-6.]

"The phrase 'adverse employment action' is a 'judicial gloss' [on the term 'discrimination' in Title VII] that 'often may help to express the idea—which the Supreme Court *has* embraced—that it is essential to distinguish between material differences and the many day-to-day travails and disappointments that, although frustrating, are not so central to the employment relation that they amount to discriminatory terms and conditions.'" *Dass*, 675 F.3d at 1068 n.9 (emphasis in original) (quoting *Minor v. Centocor, Inc.*, 457 F.3d 632, 634 (7th Cir. 2006)). "The idea behind requiring proof of an adverse employment action is simply that a statute which forbids employment discrimination is not intended to reach every bigoted act or gesture that a worker might encounter in the workplace." *Hunt v. City of Markham, Ill.*, 219

F.3d 649, 653 (7th Cir. 2000). Therefore, "[a] materially adverse employment action is something 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (quoting *Crady v. Liberty National Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993)). For example, "a materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 634 (7th Cir. 2013) (citation and quotation marks omitted). However, "[a] *purely* lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action." *Id.* (emphasis in original) (citation and quotation marks omitted).

There is no evidence that Mr. Douthit's transfer from third shift was anything but a purely lateral transfer—*i.e.*, there is no evidence that his pay or benefits would change or that his responsibilities would be materially altered. Indeed, Mr. Douthit does not even argue to the contrary. As noted above, it is well-settled that a lateral transfer, such as Mr. Douthit's transfer from third to first shift, is not an adverse employment action. *See id.*; *O'Neal v. City of Chicago*, 392 F.3d 909, 911-12 (7th Cir. 2004); *Grube v. Lau Industries, Inc.*, 257 F.3d 723, 729 (7th Cir. 2001); *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996).

Mr. Douthit resists this conclusion by arguing that his transfer was material *to him* due to his daytime childcare obligations, making his situation "nearly identical" to that of the plaintiff in *Washington*. [Filing No. 55, at ECF p. 14-15.] In *Washington*, the plaintiff filed a Title VII retaliation claim, arguing that her employer abolished her position—which allowed her to work from 7:00 a.m. until 3:00 p.m. so that she could care for her son who had Down Syndrome when

he arrived home—and assigned her to a new position that was essentially the same except that it required her to work from 9:00 a.m. to 5:00 p.m., allegedly in retaliation for her filing a formal charge of race discrimination. 420 F.3d at 659. The Seventh Circuit, applying the materially adverse standard applied for retaliation claims, recognized that "[b]y and large a reassignment that does not affect pay or promotion opportunities lacks this potential to dissuade and thus is not actionable." *Id.* at 662. But it made clear that "by and large" differs from "never." *Id.* The Seventh Circuit explained:

> What the [employer] effectively did . . . was assign [the plaintiff] a new supervisor and change her hours. Again this would not be materially adverse for a normal employee—but [the plaintiff] was not a normal employee, and [her employer] knew it. She has a vulnerability: her son's medical condition. Working 9-to-5 was a materially adverse change for her, even though it would not have been for 99% of the staff. In practical effect the change cut her wages by 25%, because it induced her to use leave for two hours per day (her salary remained the same, but her vacation and sick leave drained away, which is an effective reduction in salary). When her leave ran out, her pay fell to zero for five months, until she found a supervisor willing to let her go at 3.

*Id.*

Heartland first argues that Mr. Douthit cannot rely on *Washington* at all because it involved a retaliation claim, whereas Mr. Douthit asserts only a discrimination claim, and the standards for the two claims are different. [Filing No. 59, at ECF p. 3-4.] The Court agrees, as both the Supreme Court and the Seventh Circuit have recognized that the two claims are different. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) ("Title VII's substantive provision and its antiretaliation provision are not coterminous."); *Washington*, 420 F.3d at 660-61 (noting that "the anti-retaliation rule . . . is broader than the anti-discrimination

rule . . . in the sense that it extends beyond pay and other tangible employment actions").[2]  Even more importantly for the instant case is that the standard for whether an adverse employment action is sufficiently material to be actionable under Title VII is different for each claim.  For a retaliation claim, "[a]n employer's action is not material . . . if it would not have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Washington*, 420 F.3d at 662; *see Burlington*, 548 U.S. at 67-68 (adopting the standard set forth in *Washington*). For a discrimination claim, whether an action is materially adverse is "indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."  *Lavalais*, 734 F.3d at 634.

These standards are not the same: the anti-retaliation rule "is 'broader' than [the anti-discrimination rule] in the sense that retaliation may take so many forms, while [the anti-discrimination rule] is limited to discrimination with respect to [the worker's] compensation, terms, conditions, or privileges of employment."  *Washington*, 420 F.3d at 660 (internal quotation marks omitted).  Accordingly, the Court concludes that *Washington* is inapposite because the Seventh Circuit was applying a broader legal test than the one applicable to Mr. Douthit's discrimination claims.  *Cf. Porter v. City of Chicago*, 700 F.3d 944, 955 (7th Cir. 2012) (stating that in *Washington* the Seventh Circuit held "that given the plaintiff's unique circumstances, a reasonable jury could conclude that the alteration of her work schedule constituted an adverse employment action *for purposes of her retaliation claim*") (emphasis added).

---

[2] The Court recognizes that retaliation is a type of discrimination, *see, e.g.*, *Washington*, 420 F.3d at 660 (describing "retaliation as a form of discrimination"), but uses the phrase "discrimination claim" herein to refer to a non-retaliation race-discrimination claim.

But even if the differences in the standards do not undermine *Washington*'s persuasive force in the discrimination context, Heartland is correct that *Washington* is distinguishable from the instant case.[3]  Heartland contends that, unlike in *Washington*, there is no evidence that Mr. Douthit's transfer from third to first shift "had a direct economic impact on him."  [Filing No. 59, at ECF p. 4.]  Critical to the Seventh Circuit's decision in *Washington* was that the plaintiff's change in required hours "[i]n practical effect . . . cut her wages by 25%, because it induced her to use leave for two hours per day (her salary remained the same, but her vacation and sick leave drained away, which is an effective reduction in salary). When her leave ran out, her pay fell to zero for five months, until she found a supervisor willing to let her go at 3." 420 F.3d at 662.

---

[3] Heartland also attempts to distinguish *Washington* on the ground that there is no evidence that Heartland *knew* of Mr. Douthit's daytime childcare obligations when it suspended third-shift blending.  [Filing No. 59, at ECF p. 5-6.]  The fact that the employer in *Washington* knew of the plaintiff's particular vulnerability was key to the Seventh Circuit's decision.  *See* 420 F.3d at 663 ("A jury could find that [the employer] set out to exploit a *known* vulnerability and did so in a way that caused a significant (and hence an actionable) loss.") (emphasis added); *see also id.* (holding that the plaintiff might not have a claim if it turns out that "whoever was responsible [for the plaintiff's transfer] did not know of [her] family situation.").  Many subsequent decisions have distinguished *Washington* on this basis.  *See, e.g.*, *Porter*, 700 F.3d at 955 (distinguishing *Washington* because the plaintiff "failed to point to any evidence in the record suggesting that her assignment . . . was meant to exploit "a known vulnerability"); *Anwar Hai Khan v. EverBank*, 2013 WL 1686813, *6 (N.D. Ill. 2013) (distinguishing *Washington* because, unlike in that case, the plaintiff "failed to point to any evidence suggesting that the new requirement was meant to exploit 'a known vulnerability'").

But the evidence does not bear out Heartland's position.  Mr. Douthit contends that Heartland was well aware that he could not work the first shift because, among other reasons, "he had conveyed [his childcare] responsibilities to Dustin Mehringer" when he asked to be transferred to the third shift in 2010.  [Filing No. 55, at ECF p. 14; *see* Filing No. 54-1, at ECF p. 1.]  Heartland replies that Mr. Douthit "has not designated any evidence showing [Mr.] Mehringer was involved in the decision to suspend third shift blending."  [Filing No. 59, at ECF p. 6.]  The record evidence, however, is clear that Mr. Mehringer not only was involved in the decision to suspend third-shift blending, but was the driving force behind it.  [Filing No. 41, at ECF p. 29 (testifying that Mr. Mehringer's experimentation with staging rather than blending on third shift "was the whole reason that changes were made").]  Therefore, *Washington* is not distinguishable on this basis.

Mr. Douthit provides no similar evidence of economic harm. This is perhaps because, instead of even attempting to chart a course similar to that of the plaintiff in *Washington*, Mr. Douthit simply stopped showing up for work once he was informed that he was being transferred to the first shift. [Filing No. 42, at ECF p. 140.] But whatever the reason, Mr. Douthit's failure to present evidence that his transfer "caused a significant (and hence an actionable) loss," *Washington*, 420 F.3d at 663, distinguishes this case from *Washington*. *See Porter*, 700 F.3d at 955 (distinguishing *Washington* on the ground that the plaintiff "claims she suffered an economic loss" like the plaintiff in *Washington*, but "cite[d] no evidence" in support of that claim).

In sum, for both of the reasons articulated above, *Washington* gives the Court no reason to stray from the general rule that a "*purely* lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action." *Lavalais*, 734 F.3d at 634 (emphasis in original) (citation and quotation marks omitted). Accordingly, because Mr. Douthit has not presented evidence from which a reasonable jury could conclude he suffered a materially adverse employment action, Heartland is entitled to summary judgment on Mr. Douthit's discrimination claim. *See Dass*, 675 F.3d at 1068.

**B.    Mr. Douthit cannot prove that Heartland transferred him from third shift to first shift on the basis of his race**

Even if Mr. Douthit's transfer from third shift to first shift were a materially adverse employment action, he cannot prove that Heartland took this action because of his race. Mr. Douthit attempts to prove that his transfer was discriminatory solely under the direct method. [*See* Filing No. 55, at ECF p. 15-20.] The direct method, however, does not necessarily require

direct evidence of discrimination. Instead, a plaintiff can rely on "direct or circumstantial evidence of the employer's discriminatory animus." *Johnson*, 733 F.3d at 727.

Direct evidence of animus is "the so-called 'smoking gun.'" *Van Antwerp v. City of Peoria*, 627 F.3d 295, 298 (7th Cir. 2010). This "essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Rozskowiak v. Vill. of Arlington Heights*, 415 F.3d 608, 612 (7th Cir. 2005) (citations and quotation marks omitted). Mr. Douthit rightly does not contend that he has any direct evidence of discrimination. [*See* Filing No. 55, at ECF p. 15-16.] He does, however, maintain that he has sufficient circumstantial evidence of discrimination.

A plaintiff can also proceed under the direct method by presenting "circumstantial evidence that creates a 'convincing mosaic of discrimination' on the basis of race." *Winsley v. Cook County*, 563 F.3d 598, 604 (7th Cir. 2009) (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)). Sufficient circumstantial evidence typically falls into one of three categories:

> (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; [or] (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.

*Good v. Univ. of Chicago Medical Ctr.*, 673 F.3d 670, 675 (7th Cir. 2012) (quoting *Darchak v. City of Chicago Board of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009)). "A plaintiff may survive a motion for summary judgment based only on circumstantial evidence under the direct method, but only if the circumstantial evidence presented points 'directly to a discriminatory reason for the employer's action.'" *Id.* (quoting *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir.

2003)); *see Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003) (requiring circumstantial evidence to "point directly to a discriminatory reason for the employer's action"); *see also Hanners v. Trent*, 674 F.3d 683, 692 (7th Cir. 2012) ("[F]or a plaintiff proceeding under the direct method to defeat summary judgment using circumstantial evidence, '[a]ll that is required is evidence from which a rational trier of fact could reasonably infer that the defendant had [taken an adverse employment action against] the plaintiff because the latter was a member of a protected class.'") (quoting *Troupe*, 20 F.3d at 737).

Mr. Douthit points to four categories of evidence that he contends create a convincing mosaic that he was transferred to first shift because of his race: (1) Heartland's justification for moving him to first shift—namely, that blending was being suspended on third shift—was pretextual because Heartland began blending on third shift shortly after Mr. Douthit left his employment; (2) Heartland's newly implemented test that Blenders were required to pass evinces discriminatory intent because all four Blenders at the time were African American; (3) Ms. Montgomery sent an email to Heartland's Plant Manager detailing several instances of race discrimination and racial hostility at Heartland; and (4) Heartland's decision to issue Mr. Douthit disciplinary notices at the same time it informed him that he would have to transfer to first shift demonstrates that it "knew the transfer was going to be contentious" and that it "had a different reason for the transfer than the one given at the time." [Filing No. 55, at ECF p. 15-20.]

Heartland responds regarding each category of evidence, arguing that none helps create a convincing mosaic of discrimination, as follows: (1) its justification for Mr. Douthit's transfer could not be pretextual because third-shift blending was suspended and it admitted that it periodically resumed third-shift blending following Mr. Douthit's departure when demand so required; (2) the Blender test in no way evinces a discriminatory intent, and, in any event, does

17

not at all relate to Mr. Douthit's transfer from third to first shift; (3) Ms. Montgomery's complaints of racial hostility are irrelevant to Mr. Douthit's claims and much of the evidence regarding her complaints is inadmissible; and (4) there is no evidence that the disciplinary notices Mr. Douthit received were in any way related to his race, let alone to the decision to transfer him to first shift. [Filing No. 59, at ECF p. 9-18.]

Mr. Douthit's evidence falls well short of establishing a convincing mosaic that "points 'directly to a discriminatory reason for the employer's action.'" *Good*, 673 F.3d at 675. Simply put, none of Mr. Douthit's evidence would allow a reasonable jury to conclude that Heartland transferred Mr. Douthit from third shift to first shift *because of his race*. *See Hanners*, 674 F.3d at 692 (noting that the convincing mosaic must allow a jury to infer that the defendant [took the adverse employment action against] the plaintiff *because* the [plaintiff] was a member of a protected class.'") (emphasis added) (quoting *Troupe*, 20 F.3d at 737). An assessment of each of Mr. Douthit's four categories of evidence reveals the flaws in his position.

Beginning with the blending test and the disciplinary notices, there is no evidence showing that either of these actions was motivated by race. Mr. Douthit does not argue that the disciplinary notices were unwarranted or that other non-African American employees did not receive similar notices for engaging in similar conduct. And the events surrounding the blending test, if anything, show that Heartland wanted its Blenders—all of whom, at the time the test was instituted, were African American, [Filing No. 40, at ECF p. 4]—to have every opportunity to pass. Of the two blenders that failed the test on the first attempt, one passed the test on the second try, while the other failed again and was offered another position until his third attempt, which he passed and returned to his Blender position. [Filing No. 40, at ECF p. 3.] Heartland believed that Mr. Douthit may have cheated when he passed the test, yet provided him another

opportunity to take the exam (which he never did because he failed to show up to work shortly thereafter). [Filing No. 40, at ECF p. 4.] Such conduct on Heartland's part certainly does not evince discriminatory animus. But just as detrimental to Mr. Douthit's position is the fact that, even if the blending test and the disciplinary notices were somehow motivated by racial animus—and there is no evidence to support such conclusion—they were in no way related to Heartland's decision to transfer Mr. Douthit to first shift. Therefore, these actions do not point "directly to a discriminatory reason *for the employer's action*." *Good*, 673 F.3d at 675 (emphasis added) (citation and quotation marks omitted)

Ms. Montgomery's complaints about racial hostility fail to contribute to Mr. Douthit's mosaic for similar reasons.[4] Specifically, Ms. Montgomery's complaints that Mr. Mack "allows his maintenance employees to use racial slurs," and that she heard Mr. Hayden say that "[i]f you don't look like me I don't want you here," [Filing No. 56-1, at ECF p. 43], were in no way related to *Mr. Douthit*, let alone Heartland's decision to transfer him to first shift. Therefore, Ms. Montgomery's complaints regarding other individuals in no way point "*directly* to a discriminatory reason *for the employer's action*." *Good*, 673 F.3d at 675 (emphasis added) (citation and quotation marks omitted); *see also Dass*, 675 F.3d at 1072 (stating that a "remark can raise an inference of discrimination when it," among other things, "was . . . made . . . in reference to the adverse employment action") (citation and quotation marks omitted).

This leaves Mr. Douthit's argument that Heartland's justification for moving him to first shift—namely, that blending was being suspended on third shift—was pretextual because

---

[4] Heartland challenges the admissibility of much of the evidence regarding Ms. Montgomery's complaints. [Filing No. 59, at ECF p. 13-17.] Mr. Douthit filed a surreply brief in which he argues that this evidence is admissible. [Filing No. 60.] Because the evidence does not advance Mr. Douthit's claim even if admissible, the Court need not ultimately resolve the parties' evidentiary dispute, even though the Court has reservations about much of the evidence's admissibility.

Heartland began blending on third shift shortly after Mr. Douthit left his employment. This too fails to advance Mr. Douthit's position for at least two reasons. First, the evidence does not demonstrate that Heartland's suspension of third-shift blending was indeed pretextual—that is, "a lie." *Bodenstab v. County of Cook*, 569 F.3d 651, 657 (7th Cir. 2009) (citation and quotation marks omitted). Heartland readily acknowledged that shortly after Mr. Douthit left Heartland, third-shift blending resumed, [Filing No. 41, at ECF p. 35; Filing No. 54-3, at ECF p. 1], but the undisputed evidence is that it was indeed suspended for a time, and was done in an attempt to improve cleanliness and efficiency, [Filing No. 41, at ECF p. 28]. Moreover, it is not as if full-time third-shift blending resumed after Mr. Douthit left: "[b]lending has resumed and stopped and resumed and stopped according to the workload. . . . [D]epending on many factors, . . . it could start and stop several times." [Filing No. 41, at ECF p. 35-36.] Without any contrary evidence, a reasonable jury could not conclude that Heartland's decision to suspend third-shift blending was pretextual.

But even if it could, there is no evidence that the decision was a pretext for racial discrimination against Mr. Douthit—*i.e.*, the reinstatement of third-shift blending does not point "directly to a discriminatory reason for the employer's action." *Good*, 673 F.3d at 675 (citation and quotation marks omitted). Even if Mr. Douthit could raise a factual issue regarding whether Heartland wanted to get rid of him (which is, at best, doubtful), he has no evidence that Heartland's decision to suspend third-shift blending was made because of his race rather than Heartland's cleanliness and efficiency concerns. *See Dass*, 675 F.3d at 1072 ("There is no doubt that [the employer] wanted to get rid of [the plaintiff], but [the plaintiff's] evidence does not create a genuine factual issue as to whether [the employer] was motivated by national origin

discrimination rather than [its work-related reasons]."). For either of these reasons, the fact that third-shift blending resumed following Mr. Douthit's departure does not advance his claim.

In conclusion, Mr. Douthit has failed to present "circumstantial evidence that creates a 'convincing mosaic of discrimination' on the basis of race." *Winsley v. Cook County*, 563 F.3d 598, 604 (7th Cir. 2009). To the extent that Mr. Douthit's evidence is related to race at all (and the only evidence concerning race does not relate to him), that evidence is wholly unrelated to the challenged employment decision—transferring Mr. Douthit from third shift to first shift— and therefore does not point "directly to a discriminatory reason for the employer's action." *Good*, 673 F.3d at 675 (citation and quotation marks omitted). Simply put, it does not violate Title VII for an employer to take actions that are "inaccurate or unfair" or "be too hard on its employee," as long as the employer does not do so based on the employee's race. *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012) (citation and quotation marks omitted); *see Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 740 (7th Cir. 2013) (stating that Title VII does not protect employees against "unfair, foolish, or arbitrary" decisions of their employer that are unrelated to race). At most, Mr. Douthit produced evidence that would allow a reasonable jury to conclude that Heartland was unfair to him, but he produced no evidence that his alleged mistreatment was because of his race. Accordingly, for this additional reason, Heartland is entitled to summary judgment on Mr. Douthit's race discrimination claims.

## IV.
### CONCLUSION

For the reasons explained, the Court **GRANTS** Heartland's Motion for Summary Judgment. [Filing No. 37.] Judgment will issue accordingly.

**Distribution via ECF only to all counsel of record**